WK/ABS:AE
F. #2018R00272

**18-M-601**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ALEAH MOHAMMED,
    also known as "Aleah
    Haniff,"

                Defendant.

- - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
AN ARREST WARRANT

(T. 18, U.S.C., § 1347)

EASTERN DISTRICT OF NEW YORK, SS:

      SAMANTHA LOCKERY, being duly sworn, deposes and states that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      In or about and between May 2015 and at least January 2018, within the Eastern District of New York and elsewhere, the defendant ALEAH MOHAMMED, also known as "Aleah Haniff," together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare, Medicaid and private health insurance companies and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody of, Medicare, Medicaid and private health insurance companies in connection with the delivery of and payment for health care benefits, items, and services.

      (Title 18, United States Code, Section 1347)

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been an FBI Special Agent since 2003. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for, among other things, defrauding federal health care programs, including Medicare and Medicaid. These investigations are conducted both in an undercover and an overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2. Among other duties, I am currently participating in an investigation of violations of, among other things, 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1347 (Health Care Fraud); and 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Health Care Fraud), by the defendant ALEAH MOHAMMED, also known as "Aleah Haniff," and others known and unknown. Specifically, the investigation is focused on a scheme involving the fraudulent submission of claims for reimbursement for prescription drugs to one or more health care benefit programs, as defined in 18 U.S.C. § 24(b).

3. I am familiar with the investigation described below through my own participation in the investigation, as well as analysis of reports submitted by other law enforcement personnel, including Special Agents with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"). The facts and information contained in this Affidavit are additionally based upon discussions with other federal law enforcement officers; records discovered in the course of the investigation that have been

reviewed by myself and other law enforcement officers; my training and experience; and interviews with witnesses.

4. Because this Affidavit is being submitted for the limited purpose of seeking an arrest warrant, I have not set forth each and every fact learned during the course of this investigation, but simply those facts necessary to establish probable cause to support issuance of the warrant. Except where otherwise noted, all conversations and documents described in this Affidavit are set forth in part and in substance only.

I.  BACKGROUND

   A.  The Medicare and Medicaid Programs

5. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

6. Medicare is divided into different parts. Medicare Part D provides prescription drug coverage to persons who are eligible for Medicare.

7. CMS assigns pharmacies a national provider identification number ("NPI"). A pharmacy dispensing medications uses its assigned NPI when submitting a claim for reimbursement under Medicare Part D. A pharmacy is permitted to submit claims for reimbursement under Part D only for those medications actually dispensed and is required to maintain records verifying that it dispensed the medications.

8. Medicare beneficiaries can obtain Part D benefits in two ways: (a) by joining a Prescription Drug Plan, which covers only prescription drugs, or (b) by joining a

Medicare Advantage Plan, which covers both prescription drugs and medical services (collectively, "Part D Plans"). These Part D Plans were operated by private companies approved by Medicare and often referred to as drug plan "sponsors."

9. Medicare and Medicare drug plan sponsors were "health care benefit programs," as defined by 18 U.S.C. § 24(b).

10. A pharmacy could participate in the Part D program by entering a retail network agreement directly with a Part D Plan, or, at times through a provider agreement with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more Part D Plans. Through a Part D Plan's PBM, a pharmacy could join a Part D Plan's network. After a Part D beneficiary presented a prescription to a pharmacy and the pharmacy dispensed the medication, the pharmacy would submit a claim for reimbursement either directly to the Part D Plan or to a PBM that represented the beneficiary's Part D Plan. The Part D Plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The Part D Plan's sponsor reimbursed the PBM for its payments to the pharmacy.

11. Typically, a Medicare beneficiary enrolled in a Part D Plan obtained their prescription medications from a pharmacy authorized by the beneficiary's Part D Plan. After filling a beneficiary's prescription, the pharmacy then submitted the prescription drug claim to a Part D Plan or PBM for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number. Then, the Part D Plan or PBM, either directly or through a third party, sent a reimbursement check to the pharmacy or initiated an electronic transfer of funds to the pharmacy's bank account.

12. Each Part D plan submitted to CMS a record of each prescription drug claim it receives from a pharmacy; this record was commonly referred to as a prescription Drug Event ("PDE"). All PDE records accepted by CMS were stored in CMS's Integrated Repository for use in calculating expected Part D costs for the following year.

13. The Medicaid Program ("Medicaid") in New York State is a federally and state funded health care program providing benefits to individuals and families who met specified financial and other eligibility requirements and certain other individuals who lacked adequate resources to pay for medical care. CMS is responsible for overseeing the Medicaid program in participating states, including New York. Individuals who receive benefits under Medicaid, like those who receive benefits under Medicare, are referred to as "beneficiaries."

14. In New York State, the Medicaid program provides coverage to its beneficiaries for prescription drugs. Medicaid beneficiaries can obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment or through Medicaid Managed Care plans, which are administered by private insurance companies that are paid by Medicaid.

15. Medicaid and Medicaid Managed Care plans were "health care benefit program[s]," as defined by 18 U.S.C. § 24(b).

16. CMS developed the National Plan and Provider Enumeration System ("NPPES") to provide unique identifying numbers for health care providers. When a health care provider registered with NPPES, it is given a unique National Provider Identifier ("NPI") number. Information for providers that receive NPI numbers is contained in a publicly available database sometimes referred to as the "NPI Registry."

17.     Under New York State Medicaid policies, pharmacies must keep on file for six years signed prescriptions or fiscal orders for which Medicaid payments were claimed. For deliveries, delivery confirmation must be maintained by a pharmacy for six years from the date of payment. In addition, under these policies, telephone orders from prescribers must be reduced to writing and indicate the time of the call and the initials of the pharmacist.

B.      The Defendant and Related Companies

18.     The defendant ALEAH MOHAMMED, together with others, owned and operated four pharmacies (the "Scheme Pharmacies"). Two of these pharmacies were located at 127-04 Liberty Avenue, South Richmond Hill, New York; the other two pharmacies were located at 138-10 Farmers Boulevard, Jamaica, New York. The Scheme Pharmacies were incorporated under New York State law through the following corporations:

a.      Superdrugs, Inc. ("Superdrugs"), which also operated under the name "Superdrugs Rx," was an inactive New York corporation dissolved on or about November 10, 2017, that was located at 127-04 Liberty Avenue, South Richmond Hill, New York.

b.      Superdrugs I Inc. ("Superdrugs I"), was a New York corporation located at 127-04 Liberty Avenue, South Richmond Hill, New York.

c.      S&A Superdrugs II, Inc. ("S&A"), which also operated under the name "Superdrugs II Rx," was a New York corporation located at 138-10 Farmers Boulevard, Jamaica, New York.

d.      Superdrugs II, Inc. ("Superdrugs II"), was a New York corporation located at 138-10 Farmers Boulevard, Jamaica, New York.

19.     Certain of the Scheme Pharmacies were registered with the New York State Office of the Professions as pharmacy establishments:

6

   a. Superdrugs was so registered between approximately February 27, 2015 and January 31, 2018. The registration documents specified that Superdrugs' place of business was at 127-04 Liberty Avenue, South Richmond Hill, New York.

   b. Registration documents were submitted to register Superdrugs I as the successor to Superdrugs. The registration documents specified that Superdrugs I's place of business was at 127-04 Liberty Avenue, South Richmond Hill, New York. The New York State Board of Pharmacy denied the registration of Superdrugs I.

   c. S&A was so registered between approximately September 13, 2016 and August 31, 2019. The registration documents specified that S&A's place of business was at 138-10 Farmers Boulevard, Jamaica, New York.

  20. The defendant ALEAH MOHAMMED affirmed an application form with the New York State Board of Pharmacy on behalf of S&A on or about June 30, 2016, which identified MOHAMMED as the president and sole owner of S&A. In that form, MOHAMMED falsely affirmed, under penalties of perjury, that no owner or corporate officer of that pharmacy had ever been found guilty after trial or pleaded guilty, no contest or nolo contendere to a crime (felony or misdemeanor) in any court.

  21. The defendant ALEAH MOHAMMED affirmed an application form with the New York State Board of Pharmacy on behalf of Superdrugs I on or about January 3, 2017, which identified MOHAMMED as the president and sole owner of Superdrugs I. In that form, MOHAMMED falsely affirmed, under penalties of perjury, that no owner or corporate officer of that pharmacy had ever been found guilty after trial or pleaded guilty, no contest or nolo contendere to a crime (felony or misdemeanor) in any court.

22. According to the New York State Division of Criminal Justice Services, MOHAMMED pleaded guilty to the felony of second degree attempted burglary, on or about April 14, 2008, and to the misdemeanor of petit larceny on or about April 10, 2012, July 1, 2013 and September 4, 2014.

23. Certain of the Scheme Pharmacies entered into agreements with PBM-1, a PBM the identity of which is known to me, to provide pharmacy services:

    a. Individual-1, whose identity is known to me, signed the agreement with PBM-1 on behalf of Superdrugs. PBM-1's records identify Individual-1 as the owner of Superdrugs. I am aware that Individual-1 is married to ALEAH MOHAMMED.

    b. The defendant ALEAH MOHAMMED signed the agreement with PBM-1 on behalf of S&A. PBM-1's records identify the defendant ALEAH MOHAMMED as the owner and president of S&A.

24. Certain of the Scheme Pharmacies were registered with the NPPES:

    a. Superdrugs I registered with the NPPES on or about November 11, 2016, and ALEAH MOHAMMED was listed in the NPI Registry as the "Authorized Official," with her title identified as "Manager."

    b. S&A registered with the NPPES on or about July 18, 2016, and "DR. ALEAH MOHAMMED PHD" was listed in the NPI Registry as the "Authorized Official," with her title identified as "Pharmacy Manager."

25. The defendant ALEAH MOHAMMED, together with Individual-1, opened bank accounts in the names of the Scheme Pharmacies:

    a. On or about March 6, 2015, Individual-1 opened an account in the name of Superdrugs at Citibank, and signed the bank account signature card as the company's president.

    b. On or about June 8, 2015, Individual-1 opened an account in the name of Superdrugs at Capital One bank, and signed the bank account signature card as the company's president; the defendant ALEAH MOHAMMED was also an authorized signer for this account.

    c. On or about January 26, 2016, MOHAMMED opened an account in the name of Superdrugs II at Capital One bank, and signed the bank account signature card as the company's president; Individual-1 was also an authorized signer for this account.

    d. On or about July 28, 2016, MOHAMMED opened an account in the name of S&A at Capital One bank, and signed the bank account signature card as the company's president; Individual-1 was also an authorized signer for this account.

    e. On or about November 21, 2016, MOHAMMED opened an account in the name of Superdrugs I at Capital One bank, and signed the bank account signature card as the company's president; Individual-1 was also an authorized signer for this account.

II. FACTS SUPPORTING PROBABLE CAUSE

  26. There is probable cause to believe that the defendant ALEAH MOHAMMED, also known as "Aleah Haniff," together with others, engaged in health care fraud, in violation of 18 U.S.C. § 1347. Specifically, beginning in approximately May 2015 and continuing through at least approximately January 2018, MOHAMMED, together with others, engaged in a fraudulent scheme in which she sought unlawfully to enrich herself by submitting and causing the submission of fraudulent claims for reimbursement to Medicare, Medicaid and

private insurers for prescription drugs purportedly provided to patients by the Scheme Pharmacies that were not, in fact, prescribed by the individuals specified as the prescribing physicians in the Scheme Pharmacies' PDE records.

27.     For example, as part of the scheme, the defendant ALEAH MOHAMMED, together with others, submitted and caused the submission of claims for reimbursement to Medicare, Medicaid and private insurers for prescription drugs purportedly provided to certain beneficiaries to treat the human immunodeficiency virus ("HIV"). These HIV medications were not, in fact, prescribed by the individuals specified as the prescribing physicians in the Scheme Pharmacies' PDE records.

28.     Representatives from Insurer-1, a private insurance company the identity of which is known to me, reported to me the results of an investigation the company undertook into the Scheme Pharmacies concerning dates of service between approximately September 2016 and March 2017. According to Insurer-1's investigation, the Scheme Pharmacies billed Insurer-1 more than $300,000 for specific HIV medications for certain individuals insured by Insurer-1 where Insurer-1 had no record that those individuals were HIV-positive.

29.     On or about May 26, 2016, an anonymous individual made a complaint to law enforcement concerning the pharmacy "Superdrugs RX," located at 127-04 Liberty Avenue, Queens, New York. The anonymous complainant reported that he or she last filled a prescription at that pharmacy in September of 2015, yet subsequently found out that the pharmacy had billed his or her insurance company for 84 fraudulent claims between September 2015 and May 2016.

A. <u>Examples of Fraudulent Claims</u>

30. During the course of this investigation, I have reviewed records received from, among others, the New York State Medicaid program, the Medicare Drug Integrity Contractor ("MEDIC") and from Insurer-1.

31. The records received from these entities indicate that the Scheme Pharmacies submitted and caused the submission of claims for reimbursement on behalf of the defendant ALEAH MOHAMMED, Individual-1 and other individuals, for HIV medications that not provided to them or prescribed. The following are a few examples of a broader practice of the Scheme Pharmacies:

    a. Based on my review of records received from Insurer-1, Superdrugs submitted claims for dispensing HIV medication to the defendant ALEAH MOHAMMED and Individual-1, purportedly prescribed by Provider-1, an individual whose identity is known to me. On or about May 3, 2018, I interviewed Provider-1, who reported that MOHAMMED and Individual-1 were unknown to his or her practice. In addition, Provider-1 informed me that s/he did not write HIV medication prescriptions for any patients within his or her practice. Further, I am aware that Individual-1 was a male, and Provider-1 was a medical doctor specializing in obstetrics and gynecology.

    b. Based on my review of records received from the MEDIC, Superdrugs submitted claims for dispensing HIV medication between approximately March 17, 2016 and August 2, 2016 on behalf of Beneficiary-1, an individual whose identity is known to me. This medication was purportedly prescribed by Provider-2, an individual whose identity is known to me. On or about May 17, 2018, an HHS-OIG agent interviewed Provider-2, who reported that Beneficiary-1 was not his/her patient, s/he never prescribed HIV medication for

11

Beneficiary-1 and s/he does not write HIV medication prescriptions for any patients within his or her practice.

    c. Based on my review of records received from the MEDIC, S&A submitted claims for dispensing HIV medication between approximately May 1, 2017 and September 27, 2017 on behalf of Beneficiary-2, an individual whose identity is known to me. This medication was purportedly prescribed by Provider-3, an individual whose identity is known to me. On or about May 17, 2018, an HHS-OIG agent interviewed Provider-3, who reported that s/he never prescribed HIV medication for Beneficiary-2, and although Beneficiary-2 was his or her patient, Beneficiary-2 was not identified in the medical charts as HIV-positive.

    d. Based on my review of records received from the MEDIC, S&A submitted claims for dispensing HIV medication between approximately September 7, 2017 and December 27, 2017 on behalf of Beneficiary-3, an individual whose identity is known to me. This medication was purportedly prescribed by Provider-4, an individual whose identity is known to me. On or about May 9, 2018, an HHS-OIG agent interviewed Provider-4, who reported that although Beneficiary-3 was his or her patient, s/he never prescribed HIV medication for Beneficiary-3, and he or she has not written HIV medication prescriptions in approximately the last seven years.

    e. On or about May 10, 2018, I spoke with an office manager, whose identity is known to me, of a medical practice, the name of which is known to me. The office manager reported that an individual, who was not a patient of the medical practice, had recently called to complain about a prescription purportedly written by that practice and filled at a Superdrugs Pharmacy on Farmer's Boulevard.

B. <u>Overview of Claims</u>

32. Based on my review of claims data relating to the Scheme Pharmacies, I learned that the Scheme Pharmacies were paid the following approximate amounts for claims submitted to Medicare Part D plans and Medicaid between approximately May 2015 and January 2018:

| Program | Amount |
|---|---|
| Medicare Part D | $2,955,067 |
| Medicaid | $4,945,610 |
| TOTAL | $7,900,677 |

C.  Former Employees of the Scheme Pharmacies

33. During the course of this investigation, law enforcement agents interviewed individuals who were previously employed as pharmacists at the Scheme Pharmacies.

34. Pharmacist-1 was a licensed pharmacist and a former employee of Superdrugs, whose identity is known to me. On or about June 18, 2018, agents interviewed Pharmacist-1. Pharmacist-1 provided the following information:

    a. Pharmacist-1 worked as a part-time pharmacist at Superdrugs, at 127-04 Liberty Avenue, South Richmond Hill, New York in the fall of 2015.[1]

    b. Superdrugs was owned by ALEAH MOHAMMED and her husband. The business consisted of both a store in the front and a pharmacy towards the rear. MOHAMMED supervised the day-to-day operations of the pharmacy.

    c. MOHAMMED told Pharmacist-1 that she was a pharmacist.[2]

---

[1] This statement was generally corroborated by New York State Department of Labor records that show Pharmacist-1 was employed by Superdrugs during the fourth quarter of 2015 and the first quarter of 2016.

[2] During the investigation, the New York State Education Department, Board of Pharmacy was requested to search for license records for MOHAMMED, and agents received a response that after a diligent search, there was no record of MOHAMMED having received a license to practice pharmacy from the New York State Education Department.

   d. On multiple occasions, Pharmacist-1 observed customers come into Superdrugs and complain about certain medications that they never received but that were purportedly dispensed by Superdrugs. The defendant ALEAH MOHAMMED sometimes spoke to the customers with these complaints and, to do so, she took the customers to a part of the store away from the pharmacy.

   e. Pharmacist-1 recalled receiving few, if any, HIV-related prescriptions by phone and recalled that Superdrugs generally received few phone calls for prescriptions.

   f. Typically, either MOHAMMED or her sister, a manager at the store, opened Superdrugs each morning. MOHAMMED and her sister also had keys to the cabinets where controlled substances were kept.

   g. There were multiple computers located at Superdrugs. When Pharmacist-1 arrived at the pharmacy in the morning, MOHAMMED was frequently using one of the computers. The computers located at Superdrugs were used to administer Superdrugs' prescriptions, and Superdrugs made both physical and electronic records for prescriptions. In general, when receiving prescriptions by phone at Superdrugs, Pharmacist-1 entered the information directly into the computer, printed the prescription, signed and dated it and wrote in hand whom s/he spoke to.

   h. Superdrugs also maintained records of when customers picked up prescription drugs. It was the general practice at Superdrugs to take customers' signatures when prescription drugs were picked up in the store. For deliveries, the practice was to take customers' signatures in a notebook.

        i.      Superdrugs used pharmacy management software from Micro Merchant Systems. Pharmacist-1 knew that MOHAMMED had log-in credentials which enabled her to access the software on the pharmacy's computer. Pharmacist-1 did not recall seeing either MOHAMMED's husband or sister on the software system.[3]

      35.      Pharmacist-2 was a licensed pharmacist and a former employee of S&A, whose identity is known to me.

      36.      On or about June 19, 2018, agents interviewed Pharmacist-2. Pharmacist-2 provided the following information:

        a.      ALEAH MOHAMMED interviewed and hired Pharmacist-2 to be the supervising pharmacist of S&A, located at 138-10 Farmers Boulevard, Jamaica, New York, in the summer of 2016. S&A was a new pharmacy at that time.

        b.      Pharmacist-2 resigned from S&A in March 2017 and began working at an unrelated pharmacy on or about March 20, 2017.[4]

        c.      MOHAMMED told Pharmacist-2 that MOHAMMED was a pharmacist. Pharmacist-2 asked MOHAMMED to display her license at S&A, but MOHAMMED told Pharmacist-2 that the license was at MOHAMMED's other pharmacy. Pharmacist-2 did not recall ever actually seeing MOHAMMED's license.

---

[3] The defendant ALEAH MOHAMMED signed multiple checks to Micro Merchant Systems on behalf of the Scheme Pharmacies, including a check from on or about February 20, 2018, drawn on a Capital One bank account held in the name of S&A, bearing the memo line "computer software."

[4] These statements were corroborated by New York State Department of Labor records, showing that Pharmacist-2 was employed by S&A during the fourth quarter of 2016 and the first quarter of 2017, and by New York State Board of Pharmacy records showing Pharmacist-2's March 2, 2017 resignation as supervising pharmacist from S&A.

        d.      MOHAMMED was responsible for the day-to-day operations of S&A. MOHAMMED, Individual-1 and two other people had keys to S&A, but Pharmacist-2 did not. MOHAMMED was also responsible for ordering medications for S&A. Pharmacist-2 would sometimes add to a running list what medications needed to be ordered, and MOHAMMED reviewed it and submitted the order.

        e.      When the law enforcement agent interviewing Pharmacist-2 showed him/her a document purporting to be a printout of a May 24, 2017 telephone prescription for HIV-related medication from S&A for Individual-1, that appeared to bear Pharmacist-2's signature, Pharmacist-2 reported that s/he was not working at S&A in May 2017 and had not worked there since March 2017. Pharmacist-2 also observed that the telephone prescription record had filled in "RPH: AM," which was the record of the duty pharmacist that was logged into the software system. The log-in credentials for the software system were also the individual's initials. Pharmacist-2 reported that "AM" were ALEAH MOHAMMED's initials and log in for the software system, not Pharmacist-2's initials.

        f.      Pharmacist-2 recalled filling few, if any, HIV-related medications at S&A.

        g.      There were times when MOHAMMED was the only purported pharmacist at S&A. On multiple occasions, MOHAMMED told Pharmacist-2 to leave early; Pharmacist-2 would leave before the pharmacy was actually locked up and MOHAMMED remained in the pharmacy. In addition, Pharmacist-2 worked Monday through Friday, and MOHAMMED told Pharmacist-2 that MOHAMMED worked Saturdays.

17

    h. S&A had multiple computers. S&A used Micro Merchant Systems pharmacy management software. Pharmacist-2 observed MOHAMMED logged in to the pharmacy's computer systems.

## III.  CONCLUSION

  37. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that the defendant ALEAH MOHAMMED engaged in a scheme to defraud Medicare, Medicaid and private insurers by submitted and causing the submission of false and fraudulent claims for prescription drugs when such drugs were not medically necessary, were not provided, and did not qualify for reimbursement.

  38. Accordingly, I respectfully request that the Court issue a warrant for the arrest of defendant ALEAH MOHAMMED so that she may be brought before the Court and dealt with according to law.

  39. It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the affidavit, application and arrest warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation, and that not all of the targets of this investigation have been arrested at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Premature disclosure of the contents of this

affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Dated:   Brooklyn, New York
         July 2, 2018

*Samantha Lockery*
Samantha Lockery
Special Agent, Federal Bureau of Investigation

Sworn to before me this
2 day of July, 2018

_____
THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK